**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CR-0195-002-CVE |
| | ) | (12-CV-0491-CVE-PJC) |
| JOSEPH LYNN THORNBURGH, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On August 27, 2012, defendant Joseph Lynn Thornburgh, a federal prisoner appearing <u>pro</u> <u>se</u>, filed an amended motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Dkt. # 470).[1] Section 2255 provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence."

**I.**

On November 30, 2007, a grand jury returned a sealed indictment (Dkt. # 2) charging Joseph Thornburgh, Robert Searles, Steven Fishman, and Wayne Davidson with conspiracy to commit mail and wire fraud (count one) and conspiracy to launder money (count two). The indictment remained sealed until March 2008, and all defendants except Davidson made their initial appearances in

---

[1] Defendant has filed three motions (Dkt. ## 535, 554, 559) demanding an evidentiary hearing on his § 2255 motion. Defendant requested an evidentiary hearing as part of his § 2255 motion, and his additional requests (Dkt. ## 535, 554, 559) for an evidentiary hearing are moot. Defendant also asks the Court to expand the record and consider a decision of the Oklahoma Supreme Court disciplining his trial counsel. Defendant's motion to expand the record (Dkt. # 530) is granted.

August and September 2008.[2]  Thornburgh was represented by retained counsel, Dennis Caruso, at his initial appearance, and he was released pending trial.  Dkt. # 10.  Caruso was permitted to withdraw and the Court appointed the Federal Public Defender to represent defendant.  Dkt. # 49.  Thornburgh was dissatisfied with his court-appointed counsel and he asked the Court to appoint substitute counsel, and the Court appointed Beverly Atteberry to represent Thornburgh.  Dkt. ## 62, 67.  Thornburgh later retained another attorney, Gloyd McCoy, to represent him, and Atteberry was permitted to withdraw.  Dkt. ## 153, 154.  Defendants filed numerous pretrial motions, including motions to dismiss, but the criminal charges against defendants were not dismissed.  Searles pled guilty to an information pursuant to a written plea agreement.  Dkt. # 186.  A grand jury subsequently returned a superseding (Dkt. # 196) and second superseding (Dkt. # 239) indictment against Thornburgh and Fishman, but no additional charges were alleged in the new indictments.  Both defendant exercised their right to a jury trial.

The trial began on June 15, 2009, and the Court held a hearing before jury selection.  The parties agreed that the second superseding indictment should be read to the jury but any reference to prior convictions of Fishman and Thornburgh should be omitted.  Dkt. # 371, at 4.  The Court deferred a final decision on striking the convictions from the second superseding indictment until an evidentiary hearing set for later the same day.  Id. at 6.  The parties agreed not to mention Thornburgh's medical condition in front of the jury.  Id. at 7.  The Court selected a jury, gave them preliminary instructions, and excused the jury for the remainder of the day.  Id. at 14-21.  An evidentiary hearing was held on the afternoon of June 15, 2009, and McCoy sought to have Thornburgh's prior conviction for mail theft redacted from the second superseding indictment.  Id.

---

[2]     There is an outstanding warrant for Davidson's arrest but he remains a fugitive.

at 23.  The government argued for inclusion of the conviction in the second superseding indictment, but the government decided that it would be "wise" to redact the conviction from the second superseding indictment to avoid creating an unnecessary appellate issue.  Id. at 24-27.  The Court next took up the issue of whether the prior convictions were admissible under Fed. R. Evid. 404(b).  Id. at 28.  The Court found that Thornburgh's convictions for driving under the influence could be used for impeachment but the convictions were not admissible under Rule 404(b), and the Court kept under advisement the government's request to admit evidence of Thornburgh's federal mail theft conviction under Rule 404(b).  Id. at 30-32.  The government sought to admit evidence that Thornburgh purchased a firearm using a straw purchaser, and the Court found that the evidence was admissible only if the government could first show that he used Caribou Capital Corporation (Caribou Capital) funds to purchase the firearm.  Id. at 53-54.  The Court found that evidence  of Thornburgh's request to two investors to lie to federal agents and of his threat to hire a hit man to kill Albert Chapa, a United States Postal Inspector, were intrinsic to the charged offense and admissible.  Id. at 55.

On June 16, 2009, the parties made opening statements and stipulations were read to the jury, and the government called Chapa as its first witness.  Dkt. # 372, at 16.  Chapa testified that Marsha Longaberger contacted him about a fraudulent investment scheme, and Thornburgh was initially the focus of the investigation.  Id. at 18.  Chapa conducted additional research and obtained a search warrant for Thornburgh's apartment in Tulsa, and Thornburgh was present when the search warrant was executed.  Id. at 19.  Chapa spoke to Thornburgh and advised him that he was not under arrest, and Thornburgh made a remark that Chapa must be looking for information about "the New Zealand deal."  Id. at 20.  Chapa did not know that the fraudulent scheme had an international component at

the time of the search.  Id.  Many of the documents recovered during the search were prepared by or for Caribou Capital, and the documents showed that Thornburgh and Searles represented that they were acting on behalf of investors in the United States and New Zealand.  Id. at 23-25.  Chapa reviewed a typical agreement between Caribou Capital and an investor, which represented that the investor would receive weekly payments of $1,100,000 based on an initial investment of $100,000, and each agreement stated that the investor could request the investment be returned if the payments failed to materialize.  Id. at 32-33.  The agreements also had strict non-disclosure language preventing the investor from discussing the investment program with third- parties.  Id. at 33.  At least one of the agreements also represented that Thornburgh was holding historical bonds in trust for the investor.  Id. at 35.  Wayne Maltz advanced money to Thornburgh to allegedly work on behalf of the investors, but Maltz did not receive a return on his investment and he began to demand payment from Caribou Capital.  Id. at 47-51.  Thornburgh sent Maltz a status report representing that the bonds had successfully been placed with a bank and that the first monthly payment to investors would be made on September 27, 2002.  Id. at 51.  Maltz never received any payment from Caribou Capital.  Id. at 52.  Chapa discussed other contracts or agreements with investors and each of documents identified Thornburgh as the representative of Caribou Capital.  Id. at 53-55. Thornburgh, Fishman, and Searles worked with a person identified as Patrick Henriette to place bonds in an investment program, but the bonds never generated a profit.  Id. at 73.  On September 17, 2002, Fishman sent an e-mail to Thornburgh asking each of Caribou Capital's investors to execute an "Affidavit of Secrecy."  Id. at 81-82.  Thornburgh sent "cease and desist" letters to persons who had allegedly been trying to place bonds in investment programs, and he directed those persons to return all documents to Caribou Capital's portfolio manager, Henriette.  Id. at 87-89.

4

Thornburgh placed his historical bonds in a safekeeping depository operated by Walter Buzz Hibbard, because Fishman wanted to promote to investors that the bonds were securely held. Id. at 91-92. Thornburgh also paid Treuhand & Consulting to store historical bonds. Id. at 95-97. Chapa explained that the defendants obtained bond authentication reports from John Clancy. Id. at 100. Clancy claimed to determine if the bond was a genuine historical document and he determined a "hypothecated" value for the bond. Id. at 102-03. Clancy claimed that the hypothecated value of one $200 railroad bond was $4,012,849,262, and he valued an 1855 $500 bond at $10,032,123,150. Id. at 104. Chapa testified that no bank ever credited the hypothecated values of bonds generated by Clancy. Id. at 108.

The government was permitted to call a witness, Dennis Moore, out of turn to accommodate the witness' schedule. Moore was the deputy general counsel and solicitor general of Amtrak, and he testified that Amtrak was created in the 1970s to take over financially struggling railroad companies. Id. at 125. However, Amtrak did not assume the debts of the railroad companies, and pursuant to statutory authorization it received specified assets of the former railroad companies. Id. at 127-28. Amtrak does not own assets of the former Galveston, Houston & Henderson Railroad and it is not responsible for the debts created by any bonds issued by that company. Id. at 129, 137.

Chapa resumed his testimony and reviewed documents appearing to show that many persons were attempting to place historical bonds with investment programs on behalf of Caribou Capital, but he found no evidence that any bonds ever generated any revenue for investors. Id. at 151. Fishman sent an e-mail to Thornburgh claiming that Henriette was attending a meeting with Amtrak, the Federal Reserve Board, and the Department of Transportation on March 13, 2002, and Fishman claimed that the "flood gates will now swing open . . ." for investment opportunities with historical

5

bonds.  Id. at 158-59.  Searles sent a letter to investors stating that Thornburgh would be attending meetings in Tulsa in March 2012 and that Thornburgh's presence at the meetings was vital for the success of Caribou Capital.  Id. at 166-67.  Thornburgh traveled to Paris in October 2002 and he represented to an investor that "[e]verything is moving along well."  Id. at 183.  He also traveled to Geneva and he told the same investor that he would have a date for the "first release of funds."  Id. at 184.  At least one investor in Caribou Capital authorized Thornburgh to use the investor's Visa card while Thornburgh was in Switzerland.  Id. at 185.

On the third day of trial, the government continued the direct examination of Chapa. Pursuant to a grand jury subpeona, Searles produced over 25,000 pages of documents.  Some of the documents concerned a high yield investment program operated by Two-Thirds International, Inc. (Two-Thirds), and the program was operated by Fishman and Peter Zaccagnino.  Dkt. # 373, at 8. Two-Thirds claimed that it could place historical bonds with European banks and it offered to return an investor's money if the investor's bond was not placed in a trading program within 120 days.  Id. Thornburgh, Searles, and Davidson signed an Intermediary Agreement with Two-Thirds.  Id. at 10. One document referencing Two-Thirds concerned an investor in Auckland, New Zealand, who agreed to pay Thornburgh ten percent of any proceeds made by the investment of a historical bond. Id. at  4.   Caribou Capital represented to two other investors in Darwin, Australia that it had "valuable knowledge of buy/sell programs dealing in historical gold-backed railroad bonds," and the investors  paid $196,155 to Caribou Capital.  Id. at 16-17.  In May 2004, Fishman wrote to Henriette and advised Henriette not to communicate with Thornburgh by phone, because Fishman believed that  the IRS was monitoring Thornburgh's phone.  Id. at 21.  Chapa reviewed documents that had been provided by Fishman, and the documents showed that Clancy had advised Fishman

that certain historic railroad bonds had no redemption value.  Id. at 26-28.  E-mails written by Fishman in 2003 and 2004 established that Fishman believed that historic bonds had value only as collectibles, but the defendants continued to receive funds from investors.  Id. at 30-32, 36.  In August 2003, Fishman acknowledged to Chapa that he continued to work with Henriette but Henriette had never generated a profit from historical bonds.  Id. at 52-53.  Thornburgh's counsel, McCoy, cross-examined Chapa and established that Chapa did not personally contact any European banks to determine if attempts had made to place historical bonds in an investment program.  Id. at 60.  He also elicited testimony that none of the investors had filed a civil suit against any of the defendants.  Id. at 62.  Fishman's attorney, Stanley Monroe, conducted further cross-examination of Chapa.

Chapa's cross-examination was interrupted to accommodate the schedule of a government witness.  Matthew Johnson, a commissioned national bank examiner for the Office of the Comptroller of the Currency, testified that the historic railroad bonds upon which defendants' purported investment was based were not valid obligations of the United States Government Id. at 81-83.  In March 2001, authorities from New Zealand contacted Johnson's office to inquire about the historic railroad bonds, and his office advised the New Zealand authorities that the bonds had no monetary value aside from any historic significance.  Id. at 83-84.

Chapa's cross-examination by Fishman's attorney resumed, and Chapa testified about his communications with Fishman as he began his investigation.  Chapa interviewed Fishman several times in 2003.  Fishman provided information about some of the people he worked with and by October 2003 he was continuing to maintain that the historical bonds were a legitimate investment.  Id. at 105-06.  However, Chapa was clear that Fishman did not volunteer to assist with the

investigation until 2006. Id. at 136. Fishman continued to solicit investors until at least 2004 when he sold bonds to Barbara Johnson. Id. at 137.

The next witness called by the government was Zaccagnino, who was serving a sentence of 262 months at a federal correctional institution because he had been convicted of money laundering, mail fraud, and other financial crimes. Id. at 180. In 1997, Zaccagnino purchased historical railroad bonds for about $10,000 each and he was told by business associates that the bonds could be put into an investment program, and he considered the purchase an investment for his personal benefit. Id. at 182-84. Zaccagnino and Howard Fields III formed an entity called Two-Thirds to market bonds, and they intended to place the bonds in an investment program managed by a Spanish citizen, Jose Buisan. Id. at 184. Zaccagnino went to California to meet Gerald Dobbins, and Dobbins referred potential investors to Zaccagnino. Id. at 185. Zaccagnino intended to maintain his car dealership in Florida, but investors began to give Zaccagnino money so that he could work with historical bonds on a full-time basis. Id. at 187. In November 1997, Zaccagnino met Fishman, because Fishman wished to place his bonds with Two-Thirds. Id. at 189. Fishman introduced a major client to Zaccagnino and they agreed to go into business together. Id. at 190. Zaccagnino became acquainted with Thornburgh and Searles, and he learned that Thornburgh and Searles were partners in a business called Caribou Capital. Id. at 193-94. Thornburgh and Searles wanted to solicit investors to purchase historical bonds, and they made an arrangement to receive a commission for bonds purchased from Two-Thirds. Id. at 195. Caribou Capital was also making money by directly charging its clients a fee for purchasing bonds from Two-Thirds. Id. at 196-99. Two investors in New Zealand, Gordon and Max Pellow, purchased bonds from Two-Thirds with the help of Thornburgh and Searles. Id. at 199. Zaccagnino identified numerous other investors that were

brought to Two-Thirds by Caribou Capital.  Id. at 200-02.  In February 1998, Zaccagnino learned from Fishman that Buisan lied about his connections with European banks and there was no chance that Buisan could generate a profit from the bonds.  Id. at 203.  Fishman later introduced Henriette to Zaccagnino, but Zaccagnino did not believe that Henriette could actually generate a profit from historical bonds.  Id. at 206.  However, Zaccagnino did not stop selling bonds because he was making so much money, but he believed that the bonds were a "dead end" as a legitimate investment.  Id. at 207.  Zaccagnino believes that Fishman and Thornburgh went to Europe at least once in 2003, but they were unsuccessful in any attempts to generate income from historical bonds. Id. at 216.  McCoy cross-examined Zaccagnino and established that the last time Zaccagnino met Thornburgh was in 2003.  Dkt. # 374, at 7.  Thornburgh and Searles were selling Chinese bonds and Thornburgh told Zaccagnino that a woman named Norah Cali was assisting them.  Id.  Two-Thirds sold bonds to at least a dozen of Caribou Capital's clients.  Id. at 8.  Zaccagnino testified that, no later than 2001, Fishman was aware that historical bonds were a scam.  Id. at 47.

Hibbard  testified that he was a collector of historical bonds as a hobby, and he contacted Zaccagnino to find out if there was a way to make money from the bonds as an investment.  Id. at 55-56.  Hibbard met Zaccagnino several times and eventually was permitted to place his bonds with Zaccagnino at no cost, because Hibbard was going to refer additional clients to Zaccagnino.  Id. at 60-61.  Fishman contacted Hibbard in 2000 and asked Hibbard to open a depository for historical bonds, and Hibbard was initially uninterested in Fishman's proposal.  Id. at 65-66.  Hibbard changed his mind and later opened a depository in 2001.  Id. at 70.  Fishman invited Hibbard to California to meet Henriette and other investors.  Hibbard went to Fishman's house in California, and he met Thornburgh and Searles.  He knew that Thornburgh and Searles worked with Fishman, and

9

Thornburgh and Searles had their clients send documents to Hibbard for safekeeping.  Id. at 83-84.

Hibbard also had a private meeting with Henriette, and Henriette encouraged Hibbard to continue

investing in historical bonds, even though the investments had been unsuccessful in the past.  Id. at

72.  Fishman prepared all of the necessary paperwork and Hibbard provided the completed

paperwork to Fishman.  Id. at 76.  Hibbard gave more money to Fishman and his associates but he

never received a return on his investment, and he closed his depository in 2005.  Id. at 77.  Hibbard

contacted Fishman in 2007 after learning that Fishman had lied about the background of the

supposed broker for Chinese bonds, Cali.  Id. at 88-89.  Fishman had claimed that Cali was related

to Alan Greenspan and that she was one of the top bond traders in the world.  Id. at 80.  Fishman

also acknowledged that he lied about Henriette's background and business connections.  Id. at 88-

89.  In 2003, Chapa contacted Hibbard and asked him to provide all documents in his possession that

belonged to Fishman, Searles, and Thornburgh, and Thornburgh was angry and told Hibbard not

provide any of his documents to government agents.  Id. at 90.  Chapa had provided a grand jury

subpoena to Hibbard for production of the documents, and Hibbard told Thornburgh that the had to

comply with the subpoena.  Id.  Thornburgh threatened to "come down and kick in [Hibbard's] door

and blow [Hibbard's] kneecaps off with a shotgun."  Id. at 91.  Hibbard told Thornburgh that he was

going to comply with the subpoena, and Thornburgh called back a couple of days later to renew his

threats.  Id.  McCoy cross-examined Hibbard and tried to clarify when Thornburgh allegedly made

threatening calls to Hibbard.  Id. at 122.  Hibbard explained that he spoke to Thornburgh in early

2003 and he demanded that Thornburgh remove approximately 2,500 documents from the

depository that related to Chinese bonds.  Id. at 123.  Hibbard spoke to Thornburgh again in

December 2003 and Thornburgh made threatening remarks, and Hibbard reported the threats to

Chapa. Id. at 124.  On cross-examination by Fishman's attorney, Monroe, Hibbard explained that he became suspicious of Thornburgh, Searles, and Caribou Capital, because he was receiving competing claims to documents in the depository that had been sent to him by Thornburgh and Searles.  Id. at 148.

David Gildar testified that he became interested in historical bonds in 1997 and a friend introduced him to Searles.  Id. at 172-73.  Gildar was skeptical about the investment programs described by Searles, and he met with Searles, Thornburgh, and Terry O'Toole in Atlanta.  Id. at 177.  Gildar agreed to invest money and he understood that Searles and Thornburgh would receive "a piece of the action" from the investment.  Id. at 178.  Gildar made Searles and Thornburgh sign a promissory note for the amount he invested in case the investment did not work out, and he subsequently wired $40,000 to Dobbins as an intermediary for Searles and Thornburgh.  Id. at 179. Gildar frequently spoke to Searles and Thornburgh about his investment, and he was assured that things were moving along and that he would make money.  Id. at 182.  Gildar did not receive a return on his investment, and he entered a new agreement with Thornburgh and Zaccagnino in July 1998.  Id. at 183-84.  He paid Zaccagnino about $33,000 to purchase additional bonds.  Id. at 186. Gildar also met Fishman and went to Fishman's house to meet Henriette.  Id. at 188.  McCoy cross-examined Gildar and elicited testimony that Gildar knew that all investments had some risk.  Id. at 204-05.

The next witness called by the government was Robert Bradley.  Bradley testified that he invested with Thornburgh and Searles, and he was told that his money had been placed in escrow in the event that the investment did not begin to make money by December 1, 2001.  Dkt. # 375, at 25.  Bradley questioned Thornburgh about the safety of the investment, and Thornburgh assured

11

Bradley that he would not lose money. Id. at 26. Bradley and his girlfriend, Melissa Bray, jointly invested $52,000 with Searles and Thornburgh. Id. at 32. After December 1, 2001, Bradley had not received any payment and he demanded his money back, but Searles and Thornburgh provided excuses as to why they could not refund Bradley's investment. Id. at 33-36. Fishman told Bradley about a new investment program using Chinese bonds, and Bradley bought Chinese bonds from Fishman. Id. at 53. Bradley did not receive any return on his investment, and he and Hibbard demanded to speak to Fishman and Cali. Id. at 53-54. Bradley spoke to Fishman and Cali and came to the belief that he would never receive a return on his investment in Chinese bonds. Id. On cross-examination by McCoy, Bradley admitted that he was an experienced investor and this testimony was elicited with the apparent intent to show that Bradley understood that there was a risk of loss in any investment. Id. at 58-59.

Wayne Maltz, an optometrist, testified that a friend introduced him to Thornburgh in 2001, and Thornburgh explained how he could generate a substantial profit with historical railroad bonds. Id. at 84-85. Thornburgh explained that much of the profits would go to humanitarian causes and this aspect of the investment appealed to Maltz. Id. at 85. Thornburgh called Maltz and told him that the opportunity to invest was closing soon and Maltz needed to make a decision quickly, and Maltz sent Thornburgh $50,000. Id. at 87. About half of the $50,000 was provided by Maltz's sister. Id. at 89. In late August 2001, Thornburgh claimed that he had an opportunity to purchase more bonds, and Maltz sent Thornburgh another $35,000. Id. at 91. Maltz continued to send money to Caribou Capital to purchase more bonds, and by the end of November 2001 Maltz had sent Thornburgh and Searles a total of $205,000. Maltz felt that the investment was safe because Thornburgh repeatedly told Maltz that his money would be refunded if the investment were

unsuccessful.  Id. at 95.  Maltz did not receive any return on his investment and he contacted Thornburgh to ask for a refund of his investment, and Thornburgh put Maltz in contact with Fishman to explain why payments to investors were being delayed.  Id. at 101-02.  In February 2002, Maltz received a call asking him to send $3,500 to pay for Thornburgh's legal expenses, and Maltz sent the money because he believed it was necessary for Thornburgh to have time to spend on the investment program Id. at 103-04.  Maltz continued to send money to Thornburgh over the next few months to pay Thornburgh's personal expenses, but he became worried when he learned that Thornburgh and Searles were no longer working together.  Id. at 105-08.  In 2002 and 2003, Maltz continued to send money to Thornburgh to pay his expenses and he paid for Thornburgh to travel to Europe.  Maltz paid a total of $108,000 to Thornburgh.  Id. at 111-30.  Maltz asked for his money back and told Thornburgh that he had no more money to send, and Thornburgh never communicated with Maltz again.  Id. at 132.  McCoy cross-examined Maltz about his relationship with Thornburgh, and Maltz admitted that he originally felt sorry for Thornburgh and that he believed Thornburgh lacked expertise in investing.  Id. at 137.

David Franco, a certified public accountant, testified that he had a client, John Estes, who was thinking about investing with Thornburgh and Searles, and Estes asked Franco to review the investment.  Id. at 211-13.  Franco spoke to Thornburgh on the phone and he characterized Thornburgh as a salesperson.  Id. at 214.  Thornburgh would refer Franco to Fishman for information about the mechanics of the investment program.  Id. at 215-18.  Estes eventually invested $57,000 with Caribou Capital, and Franco regularly sought information from Thornburgh, Fishman, and Searles about the investment.  Id. at 226.  Franco received evasive answers to his questions and formed an opinion that Estes would never receive a return on his investment.  Id. at

227.  Fishman called Franco in 2003 and 2004 to ask if he or Estes wanted to invest additional money, and Franco and Estes declined to send any more money to Fishman.  Id. at 228.

The following week, another investor, Jeff Hayslett, testified that he learned about an investment opportunity through a friend, and he received a call from Thornburgh.  Dkt. # 376, at 4. Thornburgh told Hayslett that there was no risk in investing in historical bonds because he would receive his money back if the bonds did not generate a profit.  Id. at 6.  Hayslett invested $100,000 and he received positive updates from Thornburgh about the investment.  Id. at 12.  In 2003, Hayslett received a "hold harmless" agreement from Searles in which Searles agreed to repay investors the full amount of the investment if the investor would agree not to seek recourse against Searles.  Id. at 16.  Hayslett signed the hold harmless agreement, but he did not receive any money back.  Id. at 20.  Fishman solicited another $15,000 investment from Hayslett in a purported Chinese bond program, but Hayslett never received any payment from Fishman or Thornburgh as a return on his investment.  Id. at 22-24.

Tracey Grist testified that she and her family reside in Australia and her husband was introduced to Davidson about an investment opportunity.  Id. at 38.  She and her husband met Davidson in October 2002, and Searles participated in the meeting by phone.  Id. at 39. Grist decided to invest with Caribou Capital with assurances that would get her money back if the investment did not work out, and she invested $350,000 in Australian dollars.  Id. at 44-45.  In February 2003, she began calling Davidson to see why she was not receiving a return on her investment, and Davidson explained that there were some delays and that he anticipated a return within two to three weeks. Id. at 47-48.  Grist had seen Fishman's and Thornburgh's names on documents from Caribou Capital, and she continued to receive updates from Davidson, Searles, and Fishman stating that

14

unexpected delays were preventing payments to investors. Id. at 51-60. Grist did receive a $30,000 refund of her investment from Caribou Capital. Id. at 56. Grist sent letters to Searles stating that her family needed an immediate refund of $200,000 to fund a business venture, and in response she received more claims of delay. Id. at 61-65. Searles claimed that he would refund Grist's money if she signed a termination agreement. Id. at 69-70. Grist did not receive any further refunds of her investment and she believes that the termination agreement was provided to discourage her from contacting any law enforcement agency within the applicable statute of limitations. Id. at 71-72. On cross-examination, Grist testified that she never spoke to Thornburgh or received any letters from him. Id. at 74.

Henry Pham testified that he lives in Oklahoma City and he met Thornburgh in approximately November 2001, and Thornburgh told Pham that he would receive $100,000 for forty weeks if he invested $25,000 in historical railroad bonds. Id. at 192. Searles and Thornburgh tried to get Pham to invest more money but Pham refused to send Caribou Capital any more money. Id. at 194. Thornburgh told Pham that he could request a refund of his investment if he did not begin receiving payments by December 20, 2001, but by January 2002 he had not received any payments and he contacted Thornburgh. Id. at 196. Pham received an update from Fishman stating that Henriette was working out some problems, and he believed that he would be paid soon. Id. at 199. In 2003, Thornburgh presented Pham a termination agreement and told Pham that he would get his $25,000 back if he signed the agreement, but Pham never received a refund of his investment. Id. at 200-03.

Marsha Longaberger testified that Thornburgh tried to persuade her to invest in various schemes, and he presented the railroad bonds as a "no-lose investment." Id. at 208. She agreed to

invest $10,000, and she wired $5,000 to Thornburgh's attorney and $5,000 directly to Caribou Capital. Id. at 210-11. Her agreement with Caribou Capital stated that she would receive $110,000 per week for 40 weeks beginning on October 15, 2001, and she could seek a refund of her investment if she did not receive payment by November 1, 2001. Id. at 213. She did not receive any payments, and she began to contact Thornburgh and Searles to obtain a refund of her investment. Id. at 215. She sent a letter to Searles threatening to contact a law enforcement agency if she did not receive a refund, and Searles asked her to sign a hold harmless agreement in exchange for a refund. Id. at 217. Longaberger did not receive a refund and she contacted an attorney, and the attorney told her to contact Chapa.   She spoke to Thornburgh and told him that she was going to meet with Chapa, and Thornburgh demanded that she deny all knowledge of Thornburgh or an investment scheme. Id. at 220. Longaberger did meet with Chapa and told him about her conversation with Thornburgh. Id. at 221-22.

The government called Searles to testify and he acknowledged that he was hoping for a reduction of his sentence based on his testimony.  Dkt. # 377, at 27-28.  Searles and Davidson concocted a story for investors in New Zealand and Australia that Searles had been a prisoner of war in Vietnam, and Davidson embellished the story as part of his solicitation of the purported investment in railroad bonds.  Id. at 29-30.   Searles was acquainted with Thornburgh, and Thornburgh knew that Searles was looking to participate in a high-yield investment program.  Id. at 31. Searles was initially skeptical about the railroad bonds, but Thornburgh gathered information and he put Searles in contact with Fishman.  Id. at 33.  Searles, Thornburgh, and Fishman had a conference call in mid-1997, and Fishman told them about Henriette's investment program.  Id. at 35.  Fishman later introduced Searles to Zaccagnino, and Searles and Thornburgh began to sell

16

bonds on behalf of Zaccagnino. Id. at 37. Searles and Thornburgh stopped working with Zaccagnino and worked directly with Fishman, and Searles and Thornburgh agreed to bring Davidson into the organization for the purpose of selling to investors in New Zealand and Australia. Id. at 40. Money was wired from New Zealand or Australia to Caribou Capital's bank account in the United States from 1997 to 2002, but Davidson could not find any more investors after 2002. Id. at 43. As money came in more slowly from New Zealand and Australia, Thornburgh stated that he had contacts who could put him in touch with potential investors in the United States, and Thornburgh came up with the idea of promising investors a refund. Id. at 46. Searles describe Thornburgh as a salesperson for the organization who would reach out to investors, and he was very successful at bringing investors and money into Caribou Capital. Id. at 48. Searles and Thornburgh spent investors' money on their own living expenses, but investors began to get restless when they did not receive a return on their investment. Id. at 55. Thornburgh and Searles had a falling out in 2002 and ceased to be partners, but they both continued to work with Fishman. Id. at 57. To appease frustrated investors, Fishman proposed a bond program based on Chinese bonds and Thornburgh began to promise refunds to investors pursuant to a hold harmless agreement. Id. at 58-61. They continued to solicit investors after 2002 even though their investment program had been entirely unsuccessful. Id at 65-66. McCoy cross-examined Searles and established that Thornburgh was not an owner or employee of Caribou Capital. Id. at 169-70. Thornburgh broke off their business relationship in July 2002 and Searles was not personally aware of any investors solicited after that date. Id. at 171-72.

Kathy Beckner, a special agent for the Internal Revenue Service, testified that she examined the banking records of Caribou Capital, and Caribou Capital received over $3.7 million from banks

in New Zealand and Australia and almost another $1 million from American banks.  Id. at 224-26.

Beckner determined that over $4 million of those funds came from investors in the bond schemes.

Id. at 227.

At the close of the government's case, the Court denied the written motion for judgment of

acquittal filed by McCoy.  Dkt. # 378, at 5-8.  McCoy did not call any witnesses on Thornburgh's

behalf.  McCoy made a closing argument and he asked the jury to consider evidence suggesting that

Thornburgh had a good faith belief that the investment program was legitimate.  Id. at 6.  He argued

that Thornburgh genuinely believed that Henriette could generate money with historical bonds, even

if this belief was mistaken.  Id. at 9.  On a similar theme, McCoy also argued that Thornburgh did

not have the intent to engage in a conspiracy to defraud anyone.  Id. at 10-11.  He asked the jury to

consider evidence that Thornburgh withdrew from the conspiracy more than five years before the

indictment was filed, and he argued that the case was not filed within the applicable statute of

limitations.  Id. at 12-15.  McCoy also asserted that there was a lack of evidence that Thornburgh

and Fishman entered a conspiracy or, in the alternative, he argued that the evidence suggested that

there were many separate conspiracies that varied from the single conspiracy charged in the

indictment. Id. at 16, 38. McCoy noted the lack of evidence that Thornburgh worked with Davidson

or that he had any direct involvement with the New Zealand and Australia investors.  Id. at 29.

The jury found Thornburgh and Fishman guilty of both counts and reached unanimous

agreement as to the objects of both conspiracies.  Dkt. # 287, 288.  A presentence investigation

report (PSR) was prepared by the United States Probation Office, and the PSR noted that the known

loss to victims of defendant's fraudulent scheme was $4,057,846.  Counts one and two were grouped

for the purpose of determining Thornburgh's total offense level, and the total offense level of the

most serious count was used to calculate Thornburgh's advisory guideline range.  Count two had

a total offense level of 37, as compared to 33 for count one, and an offense level of 37 was applied.

Thornburgh had seven criminal history points and a criminal history category of IV, and his advisory

guideline range was 292 to 365 months.  McCoy filed a brief sentencing memorandum asking the

Court to consider Thornburgh's age and medical condition as mitigating factors in determining his

sentence.  At the sentencing hearing, Thornburgh spoke on his own behalf and asked the Court to

consider his medical condition as a factor supporting a reduced sentence.  Dkt. # 445, at 5.  The

Court considered Thornburgh's age and health as factors supporting a sentence at the low end of the

advisory guideline range, and sentenced him to  292 months imprisonment.  Id. at 9.

Thornburgh filed a notice of appeal and he asked the Court to appoint counsel to represent

him on appeal.  Dkt. # 398.  The Court found that Thornburgh was unable to afford adequate

representation and appointed Fred Randolph Lynn to represent him on appeal.  Dkt. # 418.

Thornburgh raised the following claims on appeal:

> (1) he withdrew from the conspiracy on July 23, 2002, as a result of which the statute
> of limitations had expired by the time he was indicted; (2) the government neither
> pled nor proved that profits from illegal activities were laundered; (3) the district
> court erred when it failed to instruct the jury that they must find proof that profits
> were laundered; (4) the district court failed to make findings regarding, or require the
> government to prove the admissibility of, co-conspirator statements under Fed. R.
> Evid. 801(d)(2)(E); (5) Mr. Thornburgh was tried for acts that were not illegal when
> he committed them; (6) he should have been tried separately from his co-defendant,
> Mr. Fishman; and (7) he did not receive his [PSR] in a timely fashion.

Dkt. # 463, at 13.  The Tenth Circuit affirmed Thornburgh's convictions and sentence.  On October

3, 2011, the Supreme Court denied defendant's petition for a writ of certiorari and his convictions

became final on that date.  Thornburgh filed his § 2255 motion on August 27, 2012, and his § 2255

motion was filed within one year of the date his convictions became final.

19

## II.

Defendant asserts claims of ineffective assistance of trial and appellate counsel. He argues that McCoy's performance at trial and at the sentencing hearing was "so dismal that it failed to equate to any meaningful testing of the Government's case," and he claims that he is entitled to relief under United States v. Cronic, 466 U.S. 648 (1984). He also claims that McCoy's services were deficient under the Strickland standard, and he believes that he was prejudiced by McCoy's deficient performance. Defendant also challenges the performance of his appellate counsel for failing to argue that the evidence presented at trial resulted in a fatal variance from the charges alleged in the second superseding indictment and certain sentencing issues.

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993). A defendant can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases. Strickland, 466 U.S. at 687-88. There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688. In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Moreover, review of counsel's performance must be highly deferential. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.

To establish the second prong, a defendant must show that counsel's deficient performance prejudiced the defendant to the extent that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).   In Glover v. United States, 531 U.S. 198, 199 (2001), the Supreme Court held that "any amount of actual jail time has Sixth Amendment significance." Thus, the prejudice prong of the Strickland test does not require that any increase in sentence must meet a standard of significance. See United States v. Horey, 333 F.3d 1185, 1187-88 (10th Cir. 2003).

Construing defendant's § 2255 motion broadly, the Court finds he could be alleging seven claims in his § 2255 motion:

1)   Trial counsel failed to present a defense to the government's accusations that a conspiracy existed or that defendant was a member of the conspiracy.

2)   Trial counsel failed to challenge the government's evidence concerning the interdependence element of the conspiracy charges.

3)   Trial counsel failed to argue that there was a variance between the charges alleged in the second superseding indictment and the evidence presented at trial.

4)   Trial counsel was constitutionally ineffective for refusing to allow defendant to testify at trial.

5)   Defendant was prejudiced by a secret agreement between McCoy and Monroe under which McCoy allegedly agreed not to cross-examine witnesses at trial.

6)   Appellate counsel was ineffective for failing to argue that a fatal variance occurred at trial and that errors occurred in the calculation of defendant's advisory guideline range.

7)   Trial Counsel was ineffective during the sentencing proceedings for failing to object to certain enhancements, the amount of restitution, and defendant's criminal history category.

The government's response (Dkt. # 522) identifies the same general claims, and it has fully responded to defendant's § 2255 motion. Thornburgh filed a reply (Dkt. # 529).

**A.**

Defendant claims that his trial counsel provided ineffective assistance of counsel by failing to challenge the government's case or present evidence showing that defendant was not a member of the charged conspiracy. Dkt. # 470, at 24-36. He claims that he had no involvement with the Australia and New Zealand components of the conspiracy, and that he could not have been a member of a conspiracy that included Davidson's and Searles' conduct in Australia and New Zealand. Id. at 27-28. Defendant argues that McCoy conducted inadequate cross-examination of the government's witnesses, and he claims that McCoy should have asked additional questions in an attempt to show that defendant did not have any knowledge of Davidson's and Searles' activities. Id. at 29-31. He also argues that McCoy was ineffective for failing to require the government to present proof that the conspiracy was illegal under Australia or New Zealand law. Id. at 32-37.

Defendant claims that McCoy should have argued and offered evidence that defendant had no involvement with Davidson's and Searles activities in Australia and New Zealand. A review of the trial transcript shows that McCoy expressly argued this point during his closing argument and McCoy attempted to point out the lack of evidence linking defendant to fraudulent activity that occurred in Australia and New Zealand. He specifically argued that there was a lack of evidence as to scope of the conspiracy and whether the activities in New Zealand and Australia were within the scope of the conspiracy. Dkt. # 522-1, at 28-29. McCoy cross-examined the one witness, Grist, who traveled from Australia to testify at the trial, and McCoy established that Grist had never spoken to or met defendant. Dkt. # 387, at 73-74. Grist had heard Thornburgh's name mentioned in e-mails but did not know how Thornburgh was involved with Caribou Capital. Id. at 74. In his affidavit, McCoy states that he purposefully kept his cross-examination of Grist brief to emphasize

Thornburgh's limited role in the conspiracy.  Dkt. # 533-1, at 4.  The evidence shows that McCoy pursued a trial strategy of showing that the government had failed to meet its burden of proof that the conspiracy included the activities in New Zealand and Australia, and this was a reasonable trial strategy under the circumstances.

Defendant argues that McCoy conducted inadequate cross-examinations of Chapa and Searles as to defendant's involvement with Davidson, and a more vigorous cross-examination would have established that the Australia and New Zealand activities were outside the scope of Thornburgh's agreement with the co-conspirators.  Dkt. # 470, at 29-31.  He claims that McCoy conducted a brief and inadequate cross-examination of Chapa, and further cross-examination would have shown that defendant never had any contact with Davidson.  Id. at 29.  Defendant is correct that McCoy conducted a fairly limited cross-examination of Chapa.  See Dkt. # 373, at 59-62. McCoy cross-examined Searles about the operation of Caribou Capital and elicited testimony that Thornburgh lacked the authority to sign checks or contracts on behalf of the corporation and that Thornburgh ceased his involvement with Caribou Capital in 2002.  Dkt. # 377, at 169-70.  Searles also testified on cross-examination that he and Thornburgh believed that the bond trading program was a legitimate investment and that historical bonds could be placed with European banks to generate income for investors.  Id. at 173-74.  McCoy subjected both Chapa and Searles to meaningful, although not lengthy, cross-examination, and McCoy did not provide ineffective assistance of counsel in this regard.

Defendant claims that the government failed to present evidence that the conspiracy was unlawful in New Zealand and Australia, and he argues that McCoy was ineffective for failing to challenge the government's case on this ground.  Dkt. # 470, at 32-37.  He further argues that he was

23

charged with participating in one overarching conspiracy, not separate conspiracies involving the United States and foreign countries, and McCoy should have argued that defendant could not be convicted of conspiracy for acts that could have been lawful in a foreign jurisdiction.  Id. at 33. Defendant's argument is based on assumption that the conspirators acts were actually lawful in Australia and New Zealand, but he has presented no evidence or legal authority supporting this assertion.  In any event, the charged conduct was illegal in the United States and defendant could be prosecuted for violations of the laws of the United States, even if certain acts occurred in a foreign jurisdiction.  United States v. Belfast, 611 F.3d 783, 813 (11th Cir. 2010); United States v. Yousef, 327 F.3d 56, 111-12 (2d Cir. 2003).  The Court does not find that McCoy was ineffective for failing to argue that some of the charged conduct could have been lawful in Australia or New Zealand.

**B.**

Defendant claims that McCoy was ineffective for failing to argue that the government's evidence failed to establish the interdependence element of a conspiracy charge.  Dkt. # 470, at 37-52.  Defendant's arguments are based on three general themes: (1) counsel was ineffective by failing to argue that the conspirators were working toward a common goal; (2) each agreement with an investor constituted a separate joint venture and counsel should have argued that separate joint ventures cannot be treated as a conspiracy; and (3) counsel failed to hold the government to the more precise burden of proof applicable to financial conspiracies.  Id. at 38.

"Co-conspirators are interdependent when they 'inten[d] to act together for their shared mutual benefit within the scope of the conspiracy charged."  United States v. Fishman, 645 F.3d 1175, 1189 (10th Cir. 2011).  "Interdependence may be shown if a defendant's activities 'facilitated

24

the endeavors of other alleged co-conspirators or facilitated the venture as a whole." United States v. Heckard, 238 F.3d 1222, 1230 (10th Cir. 2001).   To prove interdependence, it is not necessary for the government to prove that the defendant personally knew each member of the conspiracy or even the full scope of the conspiracy but, instead, the evidence must show that the defendant had a "general awareness of both the scope and objectives of the conspiracy." United States v. Acosta-Gallardo, 656 F.3d 1109, 1123 (10th Cir. 2011).

Defendant argues that McCoy did not effectively cross examine the government's witnesses on the issue of defendant's role in the charged conspiracy, because McCoy failed to make it clear that defendant had no contact with Davidson or Searles as to the Australia and New Zealand activities and that these activities were separate and distinct from the bond program solicited by defendant.   Id. at 38-43.   The evidence presented at trial clearly established the roles of the participants in the conspiracy and showed that the participants were working toward the common goal of soliciting an investment program based on historical bonds.   Searles testified that Thornburgh introduced him to Fishman and Zaccagnino to discuss the viability of a historical bond investment program.   Dkt. #  388, at 33.   Searles had known Davidson for several years and Davidson agreed to sell historical bonds to "farmers and the working-class people in New Zealand." Id. at 40.   Money from investors in New Zealand was wired to Caribou Capital's account in the United States.   Id. at 43.   Davidson was running out of potential investors in New Zealand, and defendant agreed to locate investors in the United States to continue the bond program being operated by Caribou Capital.   Id. at 45, 55.   Fishman was not an owner or employee of Caribou Capital, but he was responsible for creating paperwork for investors that lent an appearance of authenticity to the historical bond trading program.   Id. at 35. In other words, Davidson and

Thornburgh served as salesmen for the trading program, Fishman prepared any necessary paperwork, and Searles managed the money for Caribou Capital.  See Dkt. # 463, at 8-9. Thornburgh may not have had direct contact with Davidson or any New Zealand investor, but all of the money from investors flowed to Caribou Capital in the United States and there was overwhelming evidence presented at trial that the New Zealand and Australia activities were part of a common scheme.

The government presented substantial evidence at trial explaining defendant's role in the conspiracy and established that defendant's conduct was an essential factor for the success of the conspiracy.  MCCoy's affidavit suggests that he intended to use cross-examination to minimize defendant's role in the conspiracy, and this appearance is supported by review of the trial transcript. See Dkt. # 533-1, at 4.  McCoy cross-examined Searles and elicited testimony that defendant had limited authority to act on behalf of Caribou Capital.  Id. at 170.  Grist testified on cross-examination that she never met or spoke with defendant, and Grist was the sole witness from Australia.  Dkt. # 387, at 73-74.  McCoy established that Zaccagnino did not recall having extensive contact with defendant during his dealings with Caribou Capital.  Dkt. # 374, at 9.  McCoy also reiterated the point in his closing argument that there was little connection between defendant and Caribou Capital.  Dkt. # 522-1, at 15.  McCoy's strategy of attempting to minimize defendant's role in the conspiracy and his cross-examination of witnesses was well within the range of reasonable professional assistance.  The Court also finds that the evidence of defendant's role in the conspiracy and that defendant's participation was essential to the success of the conspiracy was overwhelming, and defendant would not have been prejudiced even if McCoy's performance were deemed ineffective in this regard.

Defendant argues that McCoy should have argued that each agreement with an investor was a separate joint venture, and he claims that McCoy failed to argue that separate joint ventures cannot be considered as evidence of a single conspiracy.  Dkt. # 470, at 44-46.  Defendant claims that he was not involved in any of the agreements with Australian or New Zealand investors, nor was Davidson a party to any agreement with a United States investor, and the similarity in the scheme or the agreements does not by itself establish that defendant and Davidson were acting as part of a broader conspiracy.  Id. at 45.  Tenth Circuit precedent establishes that it is not sufficient to establish that two persons engaged in similar conduct with similar objectives, but the persons must have acted toward  a "shared, single criminal objective" to be part of a conspiracy.  United States v. Carnegie, 533 F.3d 1231, 1239 (10th Cir. 2008).  In this case, there was clearly a single, shared objective among the conspirators and each of the conspirators was working toward the accomplishment of that goal.  Specifically, the conspirators encouraged persons to invest money in an investment program based on historical bonds, even though the bonds had no value as an investment, and all of the money paid by investors was deposited in a bank account owned by Caribou Capital.  The conspirators agreed to share the investment profits among themselves if any materialized, but in the meantime they freely spent the investors' money as they desired.  It is irrelevant if the actual documents provided to investors purported to create a joint venture, because the scheme in practice operated as a conspiracy with a single, overarching, and criminal objective.  McCoy was not ineffective by failing to raise an argument that a conspiracy could not have existed because the agreements were styled as joint ventures.

In his final argument related to interdependence, defendant argues that McCoy failed to argue that the government has a higher burden of proof in financial conspiracy cases.  Dkt. # 470,

at 47.  Defendant cites <u>Carnegie</u> and argues that interdependence must be proven more "precisely" in a financial conspiracy case, as opposed to a drug conspiracy case.  <u>Id.</u> at 47.  In a drug conspiracy case, there is no basis for a defendant to dispute that the conduct is inherently illegal, but a defendant in a financial conspiracy case may legitimately be able to argue that the common goal of the conspiracy was lawful or that the defendant reasonably believed such conduct to be lawful.  <u>Carnegie</u>, 533 F.3d at 1239 n.5.  McCoy made precisely this argument to the jury.  McCoy requested and received an instruction on the good faith defense, and argued in his closing argument that defendant believed he was participating in a legitimate investment program.  Dkt. # 522-1, at 7-9, 23-24.  In other words, McCoy did ask the jury to strictly construe the interdependence element and he specifically asked the jury to consider whether the underlying goal of the conspiracy was unlawful.  It is unclear what more McCoy could have done to hold the government to a more strict burden of proof, and the Court finds that McCoy's conduct at trial was reasonable and not deficient.

## C.

Defendant argues that there was a fatal variance between the conspiracy alleged in the indictment and the evidence presented at trial, and he claims that defense counsel was ineffective for failing to raise this argument.  The government responds that there was no variance between the indictment and the evidence presented at trial and, even if there were, defendant was not prejudiced by the narrower scope of the conspiracy that was shown by the evidence.

Defendant claims that the indictment alleged a single, broad conspiracy but the evidence offered by the government actually showed that the defendants were accused of engaging in 20

smaller conspiracies.[3]  Dkt. # 470, at 52-53.  Defendant relies on the Supreme Court's decision in

Kotteakos v. United States, 328 U.S. 750 (1946), to support his argument.  In Kotteakos, 32

defendants were charged with engaging in a conspiracy to defraud the Federal Housing

Administration (FHA), and the jury was required to consider a verdict as to 13 of the defendants.[4]

Id. at 753.  The key figure in the alleged conspiracy was Simon Brown and he acted as a broker for

other persons seeking to obtain a loan from the FHA.  Id. at 754.  While the indictment alleged a

single conspiracy, the evidence presented to the jury showed that there were at least eight groups

of persons with no connection to each other, aside from using Brown as a broker.  Id. at 755.  The

government did not dispute that there was a variance from the single conspiracy alleged in the

indictment, but it argued that the variance was not prejudicial to the defendants.  Id. at 756.  Quoting

United States v. Berger, 295 U.S. 78 (1936), the Supreme Court stated that the test is "not whether

there has been a variance of proof, but whether there has been such a variance as to 'affect the

substantial rights' of the accused."  Kotteakos, 328 U.S. at 757 (quoting Berger, 295 U.S. at 82).

The trial court instructed the jury that each defendant must be found to be a member of the single

conspiracy charged in the indictment in order to sustain a conviction, but the Supreme Court found

that the trial court's instructions were misleading.  Id. at 768.  The jury instructions "obviously

confuse[d] the common purpose of a single enterprise with the several, though similar, purposes of

numerous separate adventures of like character."  Id. at 769.  The Supreme Court found that the

---

[3]    In his reply, defendant argues the government attempted to show that there were 38 separate conspiracies.  Dkt. # 529, at 14.  For the purpose of ruling on defendant's § 2255 motion, it is not relevant how many separate conspiracies were allegedly shown by the evidence.  The key issue is whether defense counsel was ineffective for failing to raise the issue of a variance from the conspiracy alleged in the indictment.

[4]    Of the 32 defendants named in the indictment, 19 defendants went to trial and the jury was required to deliberate as to only 13 of these defendants.  Id. at 753.

common participation of one person in multiple conspiracies, even if with a similar purpose, was an insufficient basis to try all of the defendants in a single trial, and the "dangers of transference of guilt from one defendant from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place."  Id. at 774.  The single trial of multiple defendants who allegedly engaged in separate conspiracies was prejudicial to the defendants, and the defendants' convictions were reversed.

Defendant appears to be arguing that each agreement with a potential investor constituted a separate conspiracy, and he has attached an exhibit outlining his view that were numerous separate conspiracies.  Dkt. # 470, at 112-13.  The government disagrees with defendant's view of the case and argues that the evidence presented at trial was consistent with the single conspiracy alleged in the second superseding indictment.  Dkt. # 522, at 31-32.  The second superseding indictment clearly alleges that Thornburgh, Fishman, Davidson, and Searles engaged in a single conspiracy to commit mail and wire fraud by means of the solicitation of a an investment program that would generate substantial profits using historical bonds.  The evidence presented at trial was consistent with the theory of the case outlined in the second superseding indictment, and defendant has not pointed to any specific evidence tending to support his argument that there was a variance, let alone a fatal variance.  Trial counsel had no basis to argue that there was a fatal variance between the second superseding indictment and the evidence offered at trial, and trial counsel was not ineffective for failing to raise this argument at trial.

**D.**

Defendant argues that he wanted to testify at trial and he advised McCoy of his desire to testify, but McCoy refused to allow defendant to testify and he argues that he was prejudiced by

McCoy's decision.  Dkt. # 470, at 61-68.  McCoy has submitted an affidavit stating that he had numerous discussions with defendant about his right to testify at trial and defendant never expressed any interest in testifying at trial.  Dkt. # 533-1, at 3.

Defendant claims that he repeatedly demanded to testify at trial and trial counsel refused to allow him to testify.  He argues that he would have testified as to three broad topics.  First, he states that he would have testified that he lacked any knowledge about activities in Australia and New Zealand, and he claims that this would have refuted evidence concerning the existence of a conspiracy.  Id. at 63.  Second, he would have testified that each joint venture agreement with a potential investor was an individual transaction that was not part of a broader conspiracy, and he believes that this would have shown a lack of interdepence among the alleged conspirators.  Id. at 64.  Third, he claims that his testimony would have been relevant to show that there was a fatal variance by explaining that he had little knowledge of Searles' activities, and he would have testified that he was unaware of the "others" identified in the second superseding indictment.  Id.  In addition to these topics, he states that he would have explained to the jury that he had contact with only 15 or fewer American investors, and he had no contact with Davidson concerning his activities in Australia and New Zealand.  Id. at 65.  Defendant cites United States v. Evans, 970 F.2d 663 (10th Cir. 1992), for the proposition that the "best way to assess a defendant's intended involvement in a conspiracy is to examine the conspiracy from the defendant's point of view."  Id. at 674.  Finally, defendant argues that his testimony would have impacted his appeal, because his testimony would have contradicted certain facts relied on by the Tenth Circuit when it rejected his appeal.  He claims that he would have testified in furtherance of his good faith defense and he again states that he would have testified about his lack of involvement with Davidson.

Under <u>Strickland</u>, defendant must first show that his attorney's performance was deficient. A defendant in a criminal case has the right to testify and an attorney may not prevent a client taking the stand. <u>Cannon v. Mullin</u>, 383 F.3d 1152, 1171 (10th Cir. 2004); <u>United States v. Teague</u>, 953 F.2d 1525, 1534-35 (11th Cir. 1992). The Court is presented with conflicting allegations concerning defendant's desire to testify at trial, and the Court cannot resolve this conflict without an evidentiary hearing.[5] However, it is unnecessary for the Court to resolve this factual conflict if defendant would not prevail under the prejudice prong of the <u>Strickland</u> analysis. <u>Strickland</u>, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). The Tenth Circuit has specifically applied this rule in the context of claims that counsel prohibited a defendant from testifying at trial, and the Tenth Circuit has approved of disposing of such claims under the prejudice prong of <u>Strickland</u> if the defendant's testimony would not have changed the outcome at trial. <u>United States v. Gallant</u>, 562 F. App'x 712, 718 (10th Cir. Apr. 23, 2014); <u>United States v. Lott</u>, 365 F. App'x 946, 949 (10th Cir. Feb. 16, 2010).[6]

The Court has reviewed the entire trial transcript and finds that defendant cannot show that he was prejudiced by defense counsel's alleged failure to allow defendant to testify at trial. The government presented overwhelming evidence as to each of the points raised by defendant and his testimony would not have been likely to sway even one juror in his favor. As to the first point raised

---

[5]     The government asks the Court to resolve this factual dispute and find that Thornburgh's conduct during trial and on appeal shows that he did not actually intend to testify at trial. Dkt. # 522, at 33. The Court does not have sufficient evidence to resolve the factual dispute raised by the pleadings, and the Court would be required to hold an evidentiary hearing if it were necessary to determine if defendant actually requested to testify at trial.

[6]     Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1: 10th Cir. R. 32.1.

by defendant, the evidence showed that Thornburgh did not directly participate in sales to investors from Australia or New Zealand, and McCoy pointed this fact out during his closing argument. Dkt. # 459, at 29. Thornburgh claims that he would have taken the stand to deny that he was involved with Davidson and his activities in Australia and New Zealand, but this fact was not substantially in dispute and Thornburgh's testimony would have been duplicative. McCoy also noted that there no evidence that Thornburgh ever met or spoke to Davidson, and he argued that Davidson's actions were outside of the scope of any conspiracy to which Thornburgh could have belonged. Id. The jury was asked to consider this issue and there is little likelihood that Thornburgh's duplicative testimony would have any impact on the jury's verdict. Thornburgh claims that he would have testified that each joint venture agreement was a separate transaction and that there was a lack of interdepence among the members of the conspiracy. However, there was overwhelming evidence presented at trial that defendant, Searles, Fishman, and Davidson were working toward a common purpose and that money from investors solicited by defendant was used for the benefit of the conspiracy, and defendant's testimony would not have been likely to have any effect on the jury on this issue. The Court also notes that the jury had copies of joint venture agreements and this evidence was available for the jury to review, and it still found that defendants Fishman and Thornburgh were guilty of conspiracy to commit wire and mail fraud. Defendant claims that he would have testified that he had little contact with Searles, and that he did not know the persons with whom Searles was communicating to further the alleged conspiracy, but the evidence presented at trial clearly showed that defendant and Searles had a falling out and that they continued to communicate through Fishman. There was substantial evidence presented at trial that defendant was aware of the activities of other conspirators and that he played an active and necessary role in

33

carrying out the objectives of the conspiracy, even if he had little direct contact with Searles after their disagreement in July 2002.  The Court finds that there is no reasonable probability that defendant's testimony would have affected the outcome of the proceedings, and defendant's claim concerning the alleged denial of his right to testify at trial is denied.

**E.**

Defendant claims that McCoy had a conflict of interest that prevented him from providing effective assistance at trial, because McCoy allegedly had an agreement with Fishman's counsel, Monroe, under which Monroe would examine witnesses at trial in exchange for legal research provided by McCoy.  Dkt. # 470, at 68-69.  The government responds that McCoy effectively examined witnesses at trial and, even if a task-sharing agreement as described by defendant existed, McCoy's performance at trial was reasonable.  Dkt. # 522, at 34-35.

Defendant claims that he has discovered evidence of an agreement between his trial counsel, McCoy, and Fishman's attorney, Monroe, to share tasks at trial.  According to Fishman, Monroe told him that he had an agreement with McCoy to handle the examination of witnesses at trial if McCoy would conduct any necessary legal research.  Dkt. # 470, at 128.  A key part of this agreement was allegedly that Monroe and McCoy would prevent their clients from testifying at trial.  Id.  Monroe allegedly told Fishman that he could not perform legal research due to budgetary restraints imposed on him as a court-appointed attorney.  Id. at 129.  McCoy denies that he had a joint defense agreement with Monroe, but he acknowledges that he shared legal research with Monroe and he discussed the case with Monroe.  Dkt. # 533-1, at 4. McCoy often conducted the initial examination of the government's witnesses and his examinations were sometimes shorter that Monroe's witness

examinations, but he conducted witness examinations with a focus on issues related to Thornburgh. Additionally, Thornburgh benefitted from Monroe's examination of witnesses. Id. at 4.

Defendant claims that his argument concerning the existence of a work-sharing agreement between McCoy and Monroe is supported by McCoy's limited examination of Chapa, and he argues that McCoy made no attempt to show that defendant's interests were adversarial to Fishman. Dkt. # 470, at 68-69. It is true that McCoy's cross-examination of Chapa was brief, but he elicited testimony that Chapa did not have personal knowledge as to whether either of the defendants or their associates made contact with European banks. Dkt. # 373, at 60-61. McCoy also established that defendant had not been subject to any civil lawsuits as a result of his actions. Id. at 62. The Court does not find that McCoy's cross-examination of Chapa was unreasonable under the circumstances. Much of Chapa's testimony on direct examination consisted of document review, and defendant acknowledges that much of Chapa's testimony did not mention defendant. It was a reasonable strategy to seek to minimize defendant's role in the conspiracy by conducting a limited cross-examination of Chapa, and it would likely have been counterproductive to have Chapa review the specific documents implicating defendant as a participant in the conspiracy as part of cross-examination. Even if the Court were to find that a reasonable attorney might have conducted a lengthier cross-examination, the Court would not find that defendant was prejudiced by McCoy's somewhat limited cross-examination of Chapa. Monroe subjected Chapa to a more lengthy cross-examination and he attempted to show that the defendants were soliciting investors with a good-faith belief that historical bonds could be a profitable investment, and both defendants benefitted from Monroe's cross-examination of Chapa. Id. at 69-70. Defendant argues that Chapa "testified regarding numerous matters which were pure suppositions," but he fails to identify even one specific

35

statement from Chapa that would fall into this category.  Dkt. # 470, at 68.  It is not clear from defendant's motion what additional matters he believes McCoy should have covered as  part of Chapa's cross-examination, and the Court finds that defendant has not shown that additional cross-examination of Chapa by McCoy would have had any bearing on the outcome on the proceedings.

The Court finds no evidence that McCoy and Monroe formed a joint defense agreement without the consent of their clients.  Defendant's belief that such an agreement existed is based only the hearsay statements of a co-defendant, and this is not a sufficient basis to infer that defense counsel formed an improper agreement to share work or prevent either Fishman or Thornburgh from testifying at trial.  There is no circumstantial evidence tending to support the existence of such an agreement.  The Court has fully reviewed the trial transcript, and McCoy conducted appropriate cross-examination of witnesses and proceeded with a clear strategy of attempting to show that defendant had a good faith belief in the success of the investment program.  In McCoy's closing argument, he also attempted to show that Thornburgh was not a member of Caribou Capital and not a member of the conspiracy, and McCoy specifically sought to distance Thornburgh from any actions by Fishman in furtherance of the conspiracy.  Dkt. # 459, at 16, 35.  There is no circumstantial evidence that can be derived from review of the trial transcript that would support the existence of joint defense agreement, and the Court finds that defendant's claim should be denied.

**F.**

Defendant claims that he received ineffective assistance of counsel in connection with the sentencing hearing, because his attorney failed to raise objections to the PSR or the amount of restitution imposed at sentencing. Dkt. # 470, at 76-96. The government concedes that an error was

made in calculating defendant's criminal history category, but it argues that the error was either waived or harmless.

Defendant argues that his criminal history was incorrectly calculated, because he received criminal history points for two separate convictions that occurred on the same day. Under United States Sentencing Guidelines § 4A1.2, "[p]rior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest." Prior sentences not separated by an intervening arrest are counted separately unless "(A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day." In paragraph 50 of the PSR, defendant received one criminal history point for an assault and battery conviction, and the date of defendant's guilty plea and sentence was December 17, 1992. In the next paragraph of the PSR, defendant also received a criminal history point for a conviction for destroying property, and he pled guilty and was sentenced on December 17, 1992. The PSR states that details as to both convictions are unavailable, but warrants were issued due to defendant's failure to pay a fine and the warrants were still active as of the date the PSR was prepared. The additional criminal history point moved defendant from criminal history category III to IV. Defendant's total offense level was 37. The advisory guideline range for an offense level of 37 and criminal history category of III was 262 to 327 months, but using a criminal history category of IV this increased to 292 to 365 months.

The government concedes that defendant should not have received a criminal history point for each conviction, but it argues that the claim is procedurally barred because defendant could have raised this issue on direct appeal. The government is correct that a direct challenge could have been raised in defendant's appeal and the substantive claim is procedurally barred. See United States v.

McGaughy, 670 F.3d 1149, 1159 (10th Cir. 2012). However, defendant is arguing that his attorney was ineffective for making certain objections to the PSR, including a challenge to the criminal history calculation, and claims of ineffective assistance of counsel generally cannot be raised on a direct appeal. United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995). The Court finds that trial counsel's failure to notice a mistake in the calculation of defendant's criminal history constitutes deficient performance, because a competent attorney would have thoroughly reviewed the PSR and made an appropriate objection to this error in the PSR. The government argues that defendant was not actually prejudiced by his attorney's failure to object to the PSR. According to the government, defendant's sentence of 292 months falls within the corrected advisory guideline range of 262-327 months and it claims that the sentence is within the "lower range" of the advisory guideline range. The Court disagrees and finds that defendant has been prejudiced by the error in the PSR. The Supreme Court has been clear that "district courts must 'begin all sentencing proceedings by correctly calculating the applicable Guidelines range.'" Peugh v. United States, 133 S. Ct. 2072, 2090 (2013) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)). The government acknowledges that two decisions by Tenth Circuit supporting the proposition that a miscalculation of the advisory guideline range that results in any increase in a defendant's sentence is sufficient to establish prejudice under Strickland. See United States v. Rayford, 496 F. App'x 767 (10th Cir. Sep. 6, 2012) (possible miscalculation of criminal history by adding an additional point to defendant's criminal history was sufficient to establish plausible claim of prejudice under Strickland);[7] United States v. Horey, 333 F.3d 1185, 1188 (10th Cir. 2003) (reversing for resentencing using correct advisory guideline range because the district court may choose to exercise its discretion to impose

---

[7]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

a lower sentence, even though the sentence imposed by the district was within the corrected advisory guideline range).

The Court finds that defendant's § 2255 motion should be granted as to his request to correct his sentence, because an error in the calculation of defendant's criminal history resulted in an increased advisory guideline range. At a minimum, defendant is entitled to argue for a sentence at the low end of the correct advisory guideline range of 262 to 327 months, and a 30 month reduction in defendant's would be substantial. However, the "default in this circuit is de novo resentencing." United States v. West, 646 F.3d 745, 750 (10th Cir. 2011). As a result, the Court finds that defendant's remaining arguments concerning his sentence are moot, because a new sentencing hearing will be set and he will be able to make any arguments concerning his sentence at the resentencing hearing.

## G.

Defendant has alleged claims of ineffective assistance of appellate counsel that the Court must consider. To the extent that defendant alleges certain arguments should have been raised on appeal, the Court must consider the merits of the omitted issue. United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995). "If the omitted issue is without merit, counsel's failure to raise it 'does not constitute constitutionally ineffective assistance of counsel.'" Id. Thus, the Court must consider whether a reasonable attorney should raised have each of the omitted claims. The Court finds that defendant's claims of ineffective assistance of appellate counsel related to his sentencing are moot, because the Court has found that trial counsel provided ineffective assistance of counsel and will set the matter for resentencing. Defendant argues that appellate counsel should have raised the issue of a fatal variance on direct appeal, but the Court has found that defendant's argument lacks merit

and appellate counsel did not provide ineffective assistance of counsel by failing to raise this issue. Defendant's claim of ineffective assistance of appellate counsel is moot in part and denied in part.

**IT IS THEREFORE ORDERED** that defendant's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 (Dkt. # 470) is **granted in part, denied in part,** and **moot in part**. Defendant's request for resentencing due to an error in the calculation of his criminal history is granted, and his remaining arguments as to alleged errors by trial counsel in the sentencing proceedings are moot. All of defendant's argument challenging the validity of his convictions are denied. Defendant's claim that appellate counsel was ineffective for failing to raise the issue of a fatal variance is denied, and his claim of ineffective assistance of appellate counsel is moot as to sentencing issues.

**IT IS FURTHER ORDERED** that the judgment and commitment (Dkt. # 335) is **vacated**, and this case is set for a **resentencing hearing on May 2, 2017 at 10:00 a.m.**[8]

**IT IS FURTHER ORDERED** that the Federal Public Defender for the Northern District of Oklahoma is directed to appoint counsel to represent defendant at his resentencing hearing.

**IT IS FURTHER ORDERED** that defendant's Motion to Expand the Record (Dkt. # 530) is **granted**.

**IT IS FURTHER ORDERED** that defendant's motions for an evidentiary hearing (Dkt. ## 535, 554, 559) are **moot**.

---

[8]     The Court has set the resentencing hearing in May 2017 to allow the parties sufficient time to bring defendant to the Northern District of Oklahoma and for defendant to confer with his counsel to make any appropriate objections to the PSR. However, the parties may ask the Court to accelerate the sentencing hearing if they do not need the full amount of time to prepare for sentencing.

**IT IS FURTHER ORDERED** that the United States Probation Office is directed to prepare a corrected Presentence Investigation Report.

**IT IS FURTHER ORDERED** that the Court Clerk is directed to transmit this Opinion and Order to the Tenth Circuit Court of Appeals in relation to Tenth Circuit Case No. 16-5180.

**DATED** this 13th day of January, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE